UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
MARIA MARTINEZ,                          :   15 Civ. 01596 (RA) (JCF)
                                         :
                 Plaintiff,              :        REPORT AND
                                         :   RECOMMENDATION
        - against -                      :
                                         :
CAROLYN W. COLVIN, Acting                :
Commissioner of Social Security,         :
                                         :
                 Defendant.              :
- - - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE RONNIE ABRAMS, U.S.D.J.:

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 6/15/16

    The plaintiff, Maria Martinez, brings this action pursuant to

section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. §

405(g), seeking review of a determination of the Commissioner of

the Social Security Administration (the "Commissioner") denying the

plaintiff's application for Supplemental Security Income benefits

("SSI").  Each party has submitted a motion for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  For the reasons that follow, I recommend that the

plaintiff's motion be granted and the defendant's motion be denied.

Background

    A.   Personal History

    Maria Martinez was born on April 23, 1959 (R. at 100)[1] in Cuba

and came to the United States in 1980 (R. at 102).  She is single

---

[1] "R." refers to the Administrative Record.

and lives with two of her three adult children and her granddaughter. (R. at 101-02). Ms. Martinez does not speak, read, or write English, and cannot read or write Spanish. (R. at 37). The record indicates that Ms. Martinez completed school through either the first or fifth grade. (R. at 265, 710). She was previously employed as a factory worker and as a baby sitter. (R. at 103-04, 111).

Ms. Martinez filed her application for SSI on November 18, 2011 (R. at 198), claiming that she had stopped working on July 30, 2010, due to major depression, asthma, osteoarthritis, uterine leioyoma, and hemorrhoids with complications (R. at 202).

B. Medical History

 1. Prior to July 15, 2013[2]

  a. Physical Impairments

Ms. Martinez saw Dr. Sarah Nosal for a gynecological examination on October 4, 2010.[3] (R. at 435). She reported using numerous medications to treat asthma, including albuterol nebulizers and Advair. (R. at 434). The plaintiff reported

---

[2] July 15, 2013, is the date of the decision of the Administrative Law Judge ("ALJ") denying benefits. (R. at 81-92).

[3] The Administrative Record establishes that the plaintiff visited Dr. Nosal regularly between for years prior to her alleged disability onset date. (R. at 300-17, 329-33, 340-432). The records pre-dating the alleged onset date occasionally discuss relevant impairments, such as lower back pain and asthma. (R. at 316, 341, 348, 385, 409, 425).

difficulty breathing.   (R. at 435).   The records noted audible wheezing and found that Ms. Martinez's asthma was poorly controlled because she was "non-adherent with med[ication]."  (R. at 437-38). Ms. Martinez had osteoarthritis and experienced back pain that was "controlled when active and [with] occasional use of pain med[ication]."  (R. at 435, 438).

On January 19, 2011, Ms. Martinez visited Dr. Nosal seeking a refill of her albuterol prescription and complaining of back pain at an intensity of four or five on a five-point scale. (R. at 449). She reported that her asthma flared up when she failed to take Advair and her back pain was ameliorated by exercise and pain medication such as naproxen.  (R. at 450-51).

At the plaintiff's physical examination on May 23, 2011, she reported that weight loss supplements she took caused tachycardia and sweating.  (R. at 457).  Dr. Nosal's findings at that time were generally unremarkable.  (R. at 457).

The plaintiff visited Dr. Nosal on August 8, 2011, to receive medical clearance for a hemorrhoidectomy.  (R. at 490, 492).  She reported back pain at an intensity of five on a scale of five, and poor vision in her right eye.  (R. at 491, 494).  Dr. Nosal cleared her for surgery.  (R. at 494-95).

On October 31, 2011, Ms. Martinez visited Dr. Nosal complaining of back pain at an intensity of five on a five-point

3

scale and seeking to refill her medications.  (R. at 574).  At a
visit on December 12, 2011, she complained of pain on her right
side, radiating down her legs.  (R. at 610).  The plaintiff stated
that her back pain was worse in cold weather and when she walked.
(R. at 611).  On examination, Dr. Nosal noted that the plaintiff
had no difficulty ambulating and was able to flex her back fully
without discomfort, although she experienced pain on the right side
of her lower back on extension, discomfort when performing a
straight leg raise and upon palpation of the paraformis muscle, and
was able to raise her right leg only to approximately 45 degrees.
(R. at 611).  Dr. Nosal diagnosed lumbago and extrinsic asthma.
(R. at 611).  On December 12, 2011, and again on January 9, 2012,
Ms. Martinez rated her back pain at an intensity of five on a five-
point scale.  (R. at 610, 621).

On January 5, 2012, Dr. William Lathan conducted a
consultative internal medicine examination.  (R. at 269).  He noted
that Ms. Martinez suffered from asthma, blindness in her right eye,
back pain in the lumbar region, and depression.  (R. at 271).  Dr.
Lathan assessed that the plaintiff could "perform all activities of
personal care and daily living" and required no assistive devices.
(R. at 269-70).  On examination of Ms. Martinez's musculoskeletal
functioning, Dr. Lathan found that her cervical spine and lumbar
spine showed full flexion, extension, lateral flexion, and rotary

movements.   (R. at 271).    Straight leg raising was negative bilaterally.   (R. at 271).   Dr. Lathan recommended Ms. Martinez avoid smoke, dust, and noxious fumes, and noted a "severe restriction for binocular vision."   (R. at 272).

The plaintiff visited Dr. Kwame Kitson on April 10, 2012, complaining of shortness of breath and pain in her intercostal muscles at an intensity of five on a five-point scale.   (R. at 680).   Dr. Kitson noted that Ms. Martinez had "questionable compliance" with her asthma medications, and that she wheezed when exhaling.   (R. at 682).   An albuterol treatment resolved her complaints.   (R. at 682).

In an appointment with a social services organization on September 4, 2012, Ms. Martinez reported that she had no travel limitations and was able to perform self-care and certain household tasks such as grocery shopping, cooking, and cleaning.   (R. at 702).   She complained of back pain at a level of three out of five, but which could increase to an intensity of four.   (R. at 705). Dr. Jee Lee noted physical complaints of bilateral blurry vision and mild tenderness in the plaintiff's right shoulder.   (R. at 705).   He further noted that she had asthma and lower back pain. (R. at 711).

b.   <u>Mental Impairments</u>

At an October 4, 2010 appointment with Dr. Nosal, Ms. Martinez reported stress, anxiety, depression, insomnia, and passive suicidal ideation, and Dr. Nosal refered her to counseling.  (R. at 438, 440).  Her records reflect a diagnosis on October 22, 2010, of a severe recurrent episode of major depressive disorder without psychotic features.  (R. at 448).  By April 29, 2011, her symptoms had decreased, but she still exhibited moderately severe depression.[4]  (R. at 460).  On May 17, 2011, the diagnosis appeared in her medical records as major depressive disorder, recurrent episode, severe, with psychotic behavior.  (R. at 463).[5]

---

[4] The treatment notes reflect a PHQ-9 score of 16.1.  (R. at 460).  The PHQ-9 is a questionnaire "used to assess and monitor the severity of a patient's depression and/or anxiety."  <u>DeJesus v. Colvin</u>, No. 12 Civ. 7354, 2014 WL 667389, at *4 n.7 (S.D.N.Y. Feb. 18, 2014) (quoting <u>Rodriguez v. Astrue</u>, 2013 WL 1225394, at *7 n. 7 (E.D.N.Y. March 27, 2013)).  A score of 15 to 19 indicates moderately severe depression; a score of 10 to 14 indicates moderate depression; and a score of 5 to 9 indicates mild depression.  University of Michigan, PHQ-9 Questionnaire for Depression Scoring and Interpretation, http://www.med.umich.edu/1info/FHP/practiceguides/depress/score.pdf (last visited June 6, 2016).

[5] The Commissioner characterizes the abbreviation "W/BHV" as "with behavior" but provides no explanation as to what that might mean.  (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Memo.") at 7).  I infer that the abbreviation indicates the presence of psychotic behavior.  <u>See</u> Reed Group, MD Guidelines, ICD-9-CM Code 294.36, www.mdguidelines.com/icd-9-cm-code/296.34 (last visited June 8, 2016).

Ms. Martinez visited Dr. Sarah Nayeem on July 6, 2011, reporting that she had been hearing voices and had "tried to hurt herself" twice during the week of the appointment.   (R. at 470). She saw Dr. James Weisbard, a psychiatrist, on July 12.   (R. at 475).   Her PHQ-9 score indicated moderate depression, and the plaintiff reported symptoms such as an inability to feel interest or pleasure in activities, tiredness, sleep disturbances, and thoughts of hurting herself.  (R. at 475).   Dr. Weisbard's mental status evaluation noted a depressed mood and constricted affect. (R. at 477).   He assigned a Global Assessment of Functioning score ("GAF")[6] of 60 and prescribed the antidepressant Effexor.   (R. at 476-77).   Ms. Martinez's condition was largely unchanged at her follow-up appointment on July 19, although she complained that the

---

[6] The GAF is a psychiatric assessment tool that generates a numerical representation of a clinician's judgment as to a patient's overall functioning along a continuum of mental health. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-5").   The GAF was dropped from DSM-5 "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice."   Id.   The GAF Scale provides scores from 1 ("[p]ersistent danger of severely hurting self or others") to 100 ("[s]uperior functioning in a wide range of activities").   American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000) ("DSM-IV").   A GAF score between 51 and 60 indicates "[m]oderate symptoms . . . [or] moderate difficulty in social, occupational, or school functioning."   DSM-IV at 34.   A GAF score of 41-50 indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning."   DSM-IV at 34.

new medication affected her sleep and was consequently advised to take it in the morning.  (R. at 484-86).

At her August 9, 2011 appointment with Dr. Weisbard, Ms. Martinez reported mild improvement in her depression and noted that her medication caused nausea, although that side effect had decreased.  (R. at 508).  She complained of sleep disturbance, irritability, difficulty concentrating, and occasional auditory hallucinations.  (R. at 508).  Dr. Weisbard noted the psychotic features of her depression in his diagnosis, and assigned Ms. Martinez a GAF of 61.  (R. at 509, 511).  On September 13, he stated that Ms. Martinez's symptoms had not improved significantly and that she continued to have auditory hallucinations.  (R. at 539).  He lowered her GAF to between 41 and 50, the range indicating serious symptoms, and replaced her Effexor prescription with a prescription for the antidpresseant nortriptyline.  (R. at 538-39).  On September 27, his assessment was similar, except that the plaintiff's depression was without psychotic features; he noted that she had tolerated her first dose of nortriptyline well and increased her dosage.  (R. at 549-50).

On October 19, 2011, Ms. Martinez reported a mild decrease in symptoms.  (R. at 563).  Dr. Weisbard noted a constricted affect, depressed mood, and slowed psychomotor activity.  (R. at 563-64). He increased her nortriptyline dosage and prescribed lithium.  (R.

at 564).  He increased the dosage of both medications on November 2, and increased the dosage of nortriptyline again on November 23 upon the plaintiff's report of increased symptoms.  (R. at 583, 593-94).  Ms. Martinez reported a mild increase in her symptoms on December 27, and Dr. Weisbard split her nortriptyline dosing to twice per day. (R. at 616-17).  On January 10, 2012, he noted no significant improvement in her symptoms and modified her nortriptyline dosing to three times per day.  (R. at 631).

On January 5, 2012, Dr. David Mahony, a psychologist, carried out a consultative psychiatric evaluation of Ms. Martinez.  (R. at 265).  She reported the following symptoms: hopelessness; loss of interest; loss of energy; diminished sense of pleasure; social withdrawal; difficulty concentrating and learning new material; and deficits in short-term memory, long-term memory, receptive language, and organization, planning, and sequencing. (R. at 265-66).  On examination, Dr. Mahony noted a dysphoric affect and dysthymic mood, and concluded that the plaintiff's attention, concentration, and memory skills were seriously impaired due to limitations in her cognitive functioning, which he rated as "[b]orderline."  (R. at 266-67).  He further indicated that her insight and judgment were poor.  (R. at 267).

Ms. Martinez claimed that she could dress, bathe, and groom herself, and could cook, clean, shop, and do laundry.  (R. at 267).

Dr. Mahony opined that Ms. Martinez could follow and understand simple directions and instructions; perform simple tasks independently; and maintain attention, concentration, and a regular schedule; however, he found that "she may have severe difficulty learning new tasks, performing complex tasks, and making appropriate decisions." (R. at 267). He concluded that Ms. Martinez's cognitive problems may significantly interfere with her ability to function on a daily basis and believed her prognosis to be poor. (R. at 267-68).

State agency psychologist R. Altmansberger reviewed Ms. Martinez's file and completed a Psychiatric Review Technique on February 6, 2012. (R. at 633). He diagnosed major depressive disorder, mild. (R. at 636). He assessed mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (R. at 643). His Mental Residual Functional Capacity Assessment noted moderate limitations in her ability to understand and remember detailed instructions and in some areas of maintaining concentration and persistence, social interaction, and adaptation. (R. at 653-54). He concluded that she was able to perform simple work. (R. at 655).

Ms. Martinez reported some improvement to Dr. Weisbard on February 22, March 21, and April 18, 2012. (R. at 263, 675, 688).

Dr. Weisbard noted no changes in his notes on the plaintiff's April 18, 2012 visit.  (R. at 688).

At an appointment with a social worker in Fall 2012, Ms. Martinez reported a history of suicidality, depression, and bipolar disorder.  (R. at 701).  Her PHQ-9 score was 15. (R. at 703).

On October 10, 2012, Dr. Weisbard completed a Treating Physician's Wellness Plan.  (R. at 692-693).  He listed Ms. Martinez's diagnoses as depression and bipolar disorder, noting that the most recent episode was severe without psychotic features. (R. at 692).  Dr. Weisbard noted that Ms. Martinez reported an increase in irritability, depressed mood, feelings of helplessness and hopelessness, loss of energy, passive suicidal thoughts, and auditory hallucinations, although she denied "command voices." (R. at 692).  He indicated a PHQ-9 score of 19.1.  (R. at 692). Finally, he concluded that the plaintiff would be unable to work for at least 12 months due to irritability.  (R at 693).

### 2.  After July 15, 2013

Dr. Weisbard issued a letter on August 7, 2013, explaining that Ms. Martinez's bipolar I disorder was difficult to treat due to its severity, her borderline intellectual functioning, and the length of time she had suffered from the condition -- he asserted it had begun in her "early adolescense" -- which "correlated to the extent of neurological degeneration of memory and executive

functioning." (R. at 716). He then outlined findings from studies of the debilitating nature of bipolar disorder, and concluded that Ms. Martinez would be unable to work for at least twelve months. (R. at 716-17).

Records from a social services organization in February 2014 indicate that Ms. Martinez reported she was unable to work due to her mental conditions, including bipolar I disorder and depression, as well as physical conditions, such as asthma, poor vision, and lower back pain. (R. at 38). Dr. Gino Zunino asserted that the plaintiff had limitations in lifting, standing, walking, pushing, and pulling, as well as in cognitive, emotional, and respiratory functioning. (R. at 59-62). He diagnosed Ms. Martinez with lumbago, asthma, and mixed hyperlipidemia, all of which were stable, and depressive disorder and bipolar disorder, both of which were unstable. (R. at 64-65).

Dr. Weisbard completed a Medical Source Statement on June 12, 2014. (R. at 22-26). He assessed a GAF of 50 and identified the following symptoms: sleep disturbance, emotional lability, panic attacks, pervasive loss of interest, psychomotor agitation or retardation, feelings of worthlessness, difficulty thinking or concentrating, social withdrawal, flat affect, and hostility and irritability. (R. at 22). He assessed marked loss of the plaintiff's ability to interact appropriately with others, accept

instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers without distracting them or exhibiting behavioral extremes, and travel in unfamiliar places. (R. at 23). He assessed moderate loss of ability to ask simple questions or request assistance, maintain socially appropriate behavior, respond appropriately to changes in the work setting, be aware of normal hazards and take precautions, use public transportation, and set realistic goals, as well as moderate restrictions of activities of daily living and moderate difficulties in maintaining social functioning. (R. at 23). Ms. Martinez would frequently have difficulties maintaining concentration, persistence, or pace. (R. at 23). Dr. Weisbard opined that Ms. Martinez's symptoms would cause her to miss work more than three times per month. (R. at 24). She had moderate or marked loss in all work-related areas of inquiry. (R. at 25). According to Dr. Weisbard, Ms. Martinez's restrictions had lasted since at least June 2012. (R. at 26).

On June 30, 2014, Dr. Nosal prepared a Medical Source Statement indicating a number of exertional restrictions, including in the length of time the plaintiff could sit, stand, and walk continuously, as well as in lifting and carrying, stooping, and repetitive use of her hands. (R. at 14-19). Her physical and mood symptoms would frequently interfere with her concentration and

severely limit her ability to deal with stress.  (R. at 15).  Dr. Nosal asserted that "distress" would require Ms. Martinez to have rest periods in addition to normal morning, lunch, and afternoon breaks, estimating that she would need to rest for four hours in an eight-hour day.  (R. at 17).  Dr. Nosal also stated that Ms. Martinez could not read, write, or tell time; that she would have significant difficulty functioning in any work setting; and that these restrictions had existed since the 1980s.  (R. at 13, 20). She noted that the plaintiff's "significant mood symptoms and anxiety [] make it difficult for her to engage in the activities which would most benefit her reported physical complaints," such as physical therapy for her back.  (R. at 13).

C.  <u>Procedural History</u>

On November 18, 2011, the plaintiff filed an application for SSI, alleging disability beginning July 30, 2010.  (R. at 81).  The claim was denied initially on February 8, 2012.  (R. at 116).  Ms. Martinez thereafter requested a hearing, which was held before ALJ James Kearns on July 3, 2013.  (R. at 98, 122).

At the hearing, Ms. Martinez was not represented by counsel and testified through an interpreter.  (R. at 98).  The plaintiff stated that she took medication for her arthritis, her bipolar disorder -- she brought what appeared to be a full bottle of lithium with her -- and her cornea.  (R. at 100-01, 104-05).  She

14

was unable to travel alone, but could take the subway when accompanied by her son. (R. at 102). She could not remember when she last worked, stating that she would "always fight" when she was working. (R. at 103). However, she noted that she had worked at a factory and in 2008 had earned some income from babysitting her granddaughter. (R. at 103). She described every day as "a disgrace," asserting that she did little from the moment she awoke in the morning but watch television, talk to her granddaughter, and feel irritated, and as if she was "fighting [] without even knowing [why]." (R. at 105-06). She testified she rarely left her apartment because her arthritis and asthma made walking and navigating the stairs difficult. (R. at 107). She could walk two to three blocks, had difficulty lifting, and had vision problems. (R. at 108-09).

Helene Feldman, a vocational expert, summarized Ms. Martinez's past jobs as general laborer or extrusion machine operator and babysitter -- all occupations requiring medium strength. (R. at 110-11). The ALJ proposed a hypothetical claimant with those past jobs, but who could do only simple and repetitive work, had limited peripheral vision, and must avoid exposure to certain environmental irritants such as extreme heat and cold, humidity, fumes, and dust. (R. at 111). Ms. Feldman testified that the hypothetical claimant could not perform any of Ms. Martinez's past work, but could

15

perform the jobs of checker-in, stubber, and sandwich maker.  (R. at 111-12).

The ALJ issued a decision on July 15, 2013, finding that the plaintiff was not disabled.  (R. at 81).  The Appeals Council denied the plaintiff's request for review on January 29, 2015, noting that the records submitted to it that post-dated the ALJ's decision were "about a later time" and therefore "d[id] not affect the decision about whether [Ms. Martinez] was disabled beginning on or before July 15, 2013."  (R. at 1-2).

Analytical Framework

   A. Determination of Disability

A claimant is disabled under the Social Security Act and entitled to disability benefits if she can demonstrate, through medical evidence, that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015).  The disability must be of "such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience,

16

engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to SSI, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4), (b). Second, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(a)(4)(ii), (c). Third, if the impairment is listed in the portion of the regulations known as "the Listings," 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(a)(4)(iii), (d). Fourth, if the claimant is unable to make the requisite showing under step three, she must prove that she does not have the residual functional capacity to perform her past work. 20 C.F.R. § 416.920(a)(4)(iv), (e). Fifth, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. §§ 416.920(a)(4)(v), (g); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan,

168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

B. <u>Judicial Review</u>

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence."  Geertgens v. Colvin, No. 13 Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6

(S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008).  Second, the court must decide whether the ALJ's decision was supported by substantial evidence.  Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d at 62, and Williams ex rel. Williams v. Bowen, 859 F.2d 255, 256 (2d Cir. 1988)).  Substantial evidence in this context is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Analysis

A.   The ALJ's Decision

ALJ Kearns evaluated Ms. Martinez's claim pursuant to the five-step sequential process and concluded that she was not

19

disabled at any time since the alleged onset date.   (R. at 92).

At step one, ALJ Kearns found that the claimant had not engaged in substantial gainful activity since November 18, 2011. (R. at 83).   At step two, he determined that she had severe impairments consisting of depression, bipolar disorder, asthma, and right eye blindness.  (R. at 83).  At step three, however, the ALJ determined that none of Ms. Martinez's impairments, either individually or in combination, was severe enough to meet or medically equal one of the "listed impairments" in 20 C.F.R. Part 404 Subpart P, Appendix 1.   (R. at 84).   Specifically, he found that her visual impairment did not satisfy the criteria of listings 2.02, 2.03, or 2.04, which relate to loss of central visual acuity, contraction of the visual field in the better eye, and visual impairment or loss of visual efficiency in the better eye.  (R. at 84).   ALJ   Kearns   similarly   evaluated   Ms.   Martinez's   mental impairments and found that "considered singly and in combination," they did not meet or medically equal the criteria of listing 12.04. (R. at 84).   She did not have marked limitations in any areas; rather, the ALJ assessed her restrictions in activities of daily living and social functioning as mild, and her restrictions with regard to concentration, persistence, or pace as moderate.  (R. at 84-85).   He asserted that the evidence did not show (1) repeated episodes of decompensation of extended duration, (2) inability to

function outside of the home or a highly supportive living environment, or (3) that mental demands or changes in her environment would lead to decompensation.  (R. at 85).

At step four, the ALJ determined that Ms. Martinez had the residual functional capacity to perform "a full range of work at all exertional levels" but was limited to performing simple and repetitive tasks and work not requiring peripheral vision.  (R. at 86).  In addition, Ms. Martinez should not have concentrated exposure to extreme temperatures, wetness, humidity, fumes, odors, dusts, gases, or poor ventilation.  (R. at 86).  In reaching this conclusion, the ALJ considered the plaintiff's reported symptoms and found that her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms."  (R. at 87).  The ALJ also found that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were "not entirely credible" and the medical evidence in the record "d[id] not support the claimant's allegations of disability."  (R. at 87).  The ALJ noted that the record revealed that Ms. Martinez was not adhering to treatment as advised and that she provided inconsistent statements regarding her abilities.  (R. at 88).  Specifically, ALJ Kearns believed that Ms. Martinez's "reported activities suggest[ed] that she ha[d] the mental ability to perform simple and routine tasks."  (R. at 88).

At step five, the ALJ concluded that the claimant was precluded from performing her past work as a general laborer because her residual functional capacity had environmental and visual limitations. (R. at 90). He did, however, find that she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, such as checker-in, stubber, and sandwich maker. (R. at 91).

The plaintiff challenges the ALJ's decision on four grounds. She claims that the Appeals Council erred in failing to consider post-decision evidence from Dr. Weisbard and Dr. Nosal. The plaintiff also argues that the ALJ failed to evaluate the opinions of the plaintiff's treating psychiatrist properly; to consider the combination of the plaintiff's mental and physical impairments in determining her residual functional capacity; and to find the plaintiff disabled in accordance with the Medical-Vocational Guidelines.

A.   Post-Decision Evidence

A claimant is expressly authorized to submit new evidence to the Appeals Council, without any requirement to demonstrate good cause. 20 C.F.R. § 416.1470(b); see also Garcia v. Commissioner of Social Security, 496 F. Supp. 2d 235, 242-43 (E.D.N.Y. 2007) (quoting Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996)). Where the new evidence is material and relates to the period on or before

the date of the disability determination, the Appeals Council must consider it.  20 C.F.R. § 416.1470(b); see Perez, 77 F.3d at 44; Brown v. Commissioner of Social Security, 709 F. Supp. 2d 248, 257 (S.D.N.Y. 2010).  If the Appeals Council fails to do so, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence."  Shrack v. Astrue, 608 F. Supp. 2d 297, 302 (D. Conn. 2009).  In order to be considered, such evidence must be both new -- meaning noncumulative of evidence in the existing record -- and material -- meaning relevant to and probative of the claimant's condition during the time period at issue.  Lisa v. Secretary of Health and Human Services, 940 F.2d 40, 43 (2d Cir. 1991); accord Sergenton v. Barnhart, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007).  In short, there must be a "reasonable possibility that the new evidence would have influenced the [ALJ] to decide [a] claimant's application differently."  Lisa, 940 F.2d at 43 (quoting Tirado v. Bowen, 852 F.2d 595, 597 (2d Cir. 1988)).

The Appeals Council declined to consider the records from June and August 2014, stating that the new information was irrelevant because it dealt with a time after May 31, 2013, the date of the ALJ's decision. (R. at 2).  The mere fact that evidence post-dates the ALJ's decision is not a sufficient reason to exclude it.  See Pollard v. Halter, 377 F.3d 183, 193-94 (2d Cir. 2004).  Here, Dr.

Weisbard specifically stated in his June 12, 2014 Medical Source Statement that the plaintiff's condition had existed and persisted with the restrictions outlined since at least June 20, 2012; Dr. Nosal stated in her June 30, 2014 Medical Source Statement that the plaintiff's condition had existed and persisted with the restrictions as outlined at least since the 1980s; and further, Dr. Weisbard's August 7, 2013 letter referred to Ms. Martinez's condition as having existed since early adolescence. Thus, the evidence subsequently filed relates to the period on or before the date of the ALJ's decision.

These more recent statements further indicate that Ms. Martinez's condition is severe and will not improve. (R. at 13, 20). This level of severity is not indicated in other reports or medical records. For example, Dr. Weisbard noted in his June 12, 2014 statement that Ms. Martinez exhibited a marked loss in her ability to perform ten work-related activities. (R. at 23 and 25). He also noted that Ms. Martinez had a marked degree of limitation with respect to activities of daily living and in maintaining social functioning, and that she frequently exhibited deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner. (R. at 23). In his letter of August 7, 2013, Dr. Weisbard explained why Ms. Martinez was unable

to function adequately in any work setting.  (R. at 716).  Such observations do not seem to have been made previously.

Dr. Nosal's June 30 Medical Source Statement indicated significant limitations with respect to Ms. Martinez's ability to sit and stand for periods of time and with her ability to complete a workday without prolonged periods of rest, as well as other exertional limitations.  (R. at 15-17).  That Ms. Martinez's ability to deal with work stress was severely limited is also apparent from Dr. Nosal's statement.  (R. at 15).

These observations do not seem to have been made previously, making them "new," and, given that the conditions were asserted to have lasted for years -- if not decades -- they are obviously relevant to Ms. Martinez's condition during the time period at issue, making them "material."  This evidence post-dating the ALJ's decision should be considered on remand.

B.   Treating Physician Rule

A treating physician's report is to be given more weight than other reports and will be controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).  "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed,

longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Engelhart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927(d)(2)). "This rule is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time." Lopez-Tiru v. Astrue, No. 09 CV 1638, 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011) (quoting Warren v. Atrue, No. 09-CV-6217, 2010 WL 2998679, at *7 (W.D.N.Y. July 27, 2010)).

The ALJ is not required to give the treating physician controlling weight, but he is required to give "good reasons" for the assignment of weight that he chooses. 20 C.F.R. § 416.927(c)(2). "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decision makers from their obligation . . . to explain why a treating physician's opinions are not being credited." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to that opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the

26

relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.   20 C.F.R. § 416.927(c)(2)-(6); see Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

ALJ Kearns afforded "little weight" to Dr. Weisbard's October 10, 2012 opinion that Ms. Martinez was "unable to work due to irritability" because the physician provided little detail for his opinion and because the conclusion was not supported by his treatment notes, which indicated that the results of the claimant's mental status examinations included intact thought processes, a neutral mood, no delusions, good impulse control, and intact memory, judgment and insight.  (R. at 89).

In his October 10, 2012 report, Dr. Weisbard noted that the plaintiff reported an increase of irritability, depressed mood, feelings of helplessness and hopelessness, loss of energy, passive suicidal thoughts, and auditory hallucinations.  (R at 692).  Prior medical notes indicated that the plaintiff had been complaining of similar symptoms for some time.  (R. at 508, 539, 549).  To be sure, the plaintiff's symptoms at the time of previous examinations (e.g. intact thought processes, a neutral mood, no delusions, good

impulse control, and intact memory, judgment, and insight) may suggest a less severe diagnosis.  However, the ALJ must consider all of the plaintiff's reported symptoms (i.e. the symptoms she experienced in the lead-up to her appointments as opposed to the symptoms she experienced while in attendance with the doctor).  There is no requirement that a treating physician's opinions be supported by objective evidence; rather, "[i]nterviewing a patient and assessing her subjective self-reported symptoms can be an acceptable clinical diagnostic technique when the condition complained of involves a substantial subjective component." Parikh v. Astrue, No. 07 CV 3742, 2008 WL 597190, at *6 (E.D.N.Y. March 2, 2008) (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) ("As a general matter, 'objective' findings are not required in order to find that an applicant is disabled." (footnote omitted)); see also Lopez-Tiru, 2011 WL 1748515, at *4 ("[A] patient's report of complaints, or history, is an essential diagnostic tool. . . . Quite frankly, the Court is unaware of what a psychiatrist is expected to do . . . other than to review the patient's history, conduct a mental status examination, and to report the results and recommendations regarding the patient's ability to function." (third alteration in original) (quoting Polis v. Astrue, No. 09 CV 379, 2010 WL 2772505, at *10 (E.D.N.Y. July 13, 2010))).  Further, it does not appear that ALJ Kearns

28

considered the possibility that Ms. Martinez's condition had deteriorated. See, e.g., Balodis v. Leavitt, 704 F. Supp. 2d 255, 266 (E.D.N.Y. 2010) (stating, "[T]he ALJ must explain his decision to choose the earlier opinion over the more recent opinion where deterioration of a claimant's condition is possible," and collecting cases).

Moreover, the ALJ discounted the opinion of Dr. Weisbard, a psychiatrist who had been seeing Ms. Martinez approximately once a month since July 2011, in favor of consultative examiner Dr. Mahony's January 5, 2012 report (noting that Dr. Mahony "based his assessment on a detailed in-person examination") and Dr. Altmansberger's residual functional capacity assessment, which was based only on his "thorough review of the record." (R. at 88). Where a long-term treating physician's opinion is discounted in favor of medical opinions from providers who have examined the claimant only once or not at all, the ALJ must provide a fuller explanation of his reasons for rejecting the treating physician's report. See, e.g., Gorman v. Colvin, No. 13 CV 3227, 2014 WL 537568, at *6 (E.D.N.Y. Feb. 10, 2014) ("[I]n light of the fact that Dr. Hou never personally examined [the claimant] and Dr. Hahn only examined him once, the ALJ's decision to give greater weight to the medical opinions of these consulting physicians than to [the treating physician's] opinion requires an explanation."); see also

Hidalgo v. Colvin, No. 12 Civ. 9009, 2014 WL 2884018, at *21 (S.D.N.Y. June 25, 2014) ("The Regulations are clear that consulting physicians' opinions are entitled only to limited weight because of their typically superficial exposure to the plaintiff.").

Finally, to the extent that ALJ Kearns thought Dr. Weisbard's report inconsistent or insufficient, he had the affirmative duty to seek clarification before rejecting it. See, e.g. Stroud v. Commissioner of Social Security, No. 13 Civ. 3251, 2014 WL 4652581, at *10 & n.10 (S.D.N.Y. Sept. 8, 2014); Correale-Englehart, 687 F. Supp. 2d at 428. In short, the ALJ failed to provide good reasons for discounting the opinion of Dr. Weisbard as to the severity of the plaintiff's mental impairments.[7]

---

[7] On remand, the ALJ will also have the benefit of medical evidence that post-dates his original decision, such as the June and August 2014 opinions of Dr. Weisbard and Dr. Nosal. Especially in light of Dr. Nosal's observation that Ms. Martinez's psychological symptoms "make it difficult for her to engage in the activities which would most benefit her reported physical complaints" (R. at 13), the ALJ should carefully take into account "the combined effect of all of [Ms. Martinez's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 416.923; see also Thompson v. Astrue, 416 F. App'x 96, 97 (2d Cir. 2011) (summary order).

The plaintiff also complains that the ALJ should have found her disabled pursuant to the section 202.09 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App. 2, under which a claimant with the residual functional capacity to engage in light work should be found disabled if she is (1) "closely

Conclusion

For the reasons set forth above, I recommend that plaintiff's motion for judgment on the pleadings (Docket no. 9) be granted, the defendant's motion for judgment on the pleadings (Docket No. 16) be denied, and the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Ronnie Abrams, Room 2203, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

---

approaching advanced age" (that is, between the ages of 50 and 54), (2) illiterate in English, and (3) unskilled or without transferrable skills. (Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings at 11). Because on remand the ALJ will reassess Ms. Martinez's residual functional capacity, it is not necessary to address this argument here.

Dated:     New York, New York
           June 15, 2016


Copies mailed this date to:

Daniel Berger, Esq.
NY Disability, LLC
1000 Grand Concourse, Suite 1-A
Bronx, NY 10451

Rebecca H. Estelle, Esq.
Social Security Administration
26 Federal Plaza, Rm 3904
New York, NY 10278